**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CALVERT L. POTTER, *et al.*, | |
| Plaintiffs, | |
| v. | No. 01-cv-1189 (RJL) |
| DISTRICT OF COLUMBIA, | |
| Defendant. | |
| STEVEN B. CHASIN, *et al.*, | CONSOLIDATED CASES |
| Plaintiffs, | |
| v. | No. 05-cv-1792 (RJL) |
| DISTRICT OF COLUMBIA, | |
| Defendant. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION FOR JUDGMENT OF CIVIL CONTEMPT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

I.      FACTUAL BACKGROUND ................................................................................. 2

        A.      Prior Litigation History .............................................................................. 2

        B.      The Department's Latest Facial Hair Policy .............................................. 5

        C.      Enforcement of The Department's New Facial Hair Policy Against
                Plaintiffs ..................................................................................................... 8

        D.      Plaintiffs' Restoration to Field Duty and Attempts to Obtain
                Compensation ............................................................................................ 11

II.     ARGUMENT ........................................................................................................ 13

        A.      Legal Standard .......................................................................................... 13

        B.      The Department Should Be Held In Contempt for Violating the
                Permanent Injunction. .............................................................................. 14

        C.      The Department's Failure to Comply with The Permanent Injunction
                Cannot Be Justified. ................................................................................. 17

III.    REQUESTED RELIEF ........................................................................................ 21

CONCLUSION ................................................................................................................ 26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*12 Percent Logistics, Inc. v. Unified Carrier Registration Plan Bd.*,
316 F. Supp. 3d 22 (D.D.C. 2018) ......................................................................14

*Act Now to Stop War & End Racism Coal. v. District of Columbia*,
2013 WL 12380268 (D.D.C. Aug. 23, 2013) .......................................................15

*Am. Mining Cong. v. U.S. Army Corps of Eng'rs*,
120 F. Supp. 2d 23 (D.D.C. 2000) ......................................................................14

*Am. Rivers v. U.S. Army Corps of Eng'rs*,
274 F. Supp. 2d 62 (D.D.C. 2003) .................................................................13, 17

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,
2017 WL 1173928 (M.D. Pa. Mar. 29, 2017) .....................................................25

*Broderick v. Donaldson*,
437 F.3d 1226 (D.C. Cir. 2006) ..........................................................................13

*Cal. Expanded Metal Prods. Co. v. Klein*,
2021 WL 4078072 (W.D. Wash. Sept. 8, 2021) .................................................25

*Cardell Fin. Corp. v. Suchodolski Assocs., Inc.*,
2012 WL 12932049 (S.D.N.Y. July 17, 2012).....................................................25

*CFTC v. Trade Exch. Network Ltd.*,
117 F. Supp. 3d 22 (D.D.C. 2015) ......................................................................14

*Davis v. Sutton*,
2005 WL 3434633 (W.D. Tenn. Dec. 13, 2005)..................................................23

*EEOC v. Guardian Pools, Inc.*,
828 F.2d 1507 (11th Cir. 1987) ..........................................................................22

*EEOC v. Local 638 . . . Local 28 of the Sheet Metal Workers' Int'l Assn.*,
117 F. Supp. 2d 386 (S.D.N.Y. 2000) .................................................................22

*Food Lion, Inc. v. United Food & Commercial Workers Int'l Union, AFL-CIO-
CLC*,
103 F.3d 1007 (D.C. Cir. 1997) ..........................................................................18

*Gompers v. Buck's Stove & Range Co.*,
221 U.S. 418 (1911).............................................................................................20

*Horne v. Flores,*
    557 U.S. 433 (2009) ........................................................................................21

*In re Grand Jury Investigation of Possible Violations of 18 U.S.C. § 1956 & 50
    U.S.C. § 1705,*
    2019 WL 2182436 (D.D.C. Apr. 10, 2019) ....................................................18

*Int'l Painters & Allied Trades Indus. Pension Fund v. ZAK Architectural Metal &
    Glass LLC,*
    736 F. Supp. 2d 35 (D.D.C. 2010) ................................................................18

*Int'l Union, United Mine Workers of Am. v. Bagwell,*
    512 U.S. 821 (1994) ........................................................................................22

*Kennedy v. Dixon,*
    1991 WL 489548 (D.C. Super. Ct. Oct. 24, 1991) ...........................................3

*Kennedy v. District of Columbia,*
    654 A.2d 847 (D.C. 1994) ................................................................................3

*Landmark Legal Found. v. EPA,*
    272 F. Supp. 2d 70 (D.D.C. 2003) ................................................................24

*MasTec Advanced Techs. v. NLRB,*
    2021 WL 4935618 (D.D.C. June 3, 2021) .....................................................15

*McCall-Bey v. Franzen,*
    777 F.2d 1178 (7th Cir. 1985) .......................................................................13

*Medina v. Buther,*
    2019 WL 4370239 (S.D.N.Y. Sept. 12, 2019) ..............................................23

*Mendoza v. Regis Corp.,*
    2005 WL 1109262 (W.D. Tex. Mar. 21, 2005)..............................................25

*N.Y. State Nat'l Org. for Women v. Terry,*
    886 F.2d 1339 (2d Cir. 1989) ........................................................................15

*Phillips v. Mabus,*
    894 F. Supp. 2d 71 (D.D.C. 2012) ................................................................13

*\* Potter v. District of Columbia,*
    558 F.3d 542 (D.C. Cir. 2009) ..............................................................4, 5, 21

*\* Potter v. District of Columbia,*
    382 F. Supp. 2d 35 (D.D.C. 2005) ..................................................................3

*Potter v. District of Columbia*,
2007 WL 2892685 (D.D.C. Sept. 28, 2007) ..........................................4, 5, 18, 20

*Salazar ex rel. Salazar v. District of Columbia*,
633 F.3d 1110 (D.C. Cir. 2011) ......................................................................21

*Schwartz v. Rent-A-Wreck of Am.*,
261 F. Supp. 3d 607 (D. Md. 2017) ................................................................23

* *SEC v. Bilzerian*,
112 F. Supp. 2d 12 (D.D.C. 2000) ....................................................14, 17, 18

*Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Artharee*,
48 F. Supp. 3d 25 (D.D.C. 2014) ....................................................................18

*Shillitani v. United States*,
384 U.S. 364 (1966)........................................................................................13

*Tranzact Techs., Inc. v. 1Source Worldsite*,
406 F.3d 851 (7th Cir. 2005) ..........................................................................25

*United States v. IBM Corp.*,
60 F.R.D. 650 (S.D.N.Y. 1973) ......................................................................25

* *United States v. Latney's Funeral Home, Inc.*,
41 F. Supp. 3d 24 (D.D.C. 2014) ..............................................................14, 22

* *Unitronics (1989) (R"G) Ltd. v. Gharb*,
85 F. Supp. 3d 133 (D.D.C. 2015) ............................................................13, 24

*Wesley Jensen Corp. v. Bausch & Lomb, Inc.*,
256 F. Supp. 2d 228 (D. Del. 2003) ................................................................25

**Statutes**

42 U.S.C. § 2000bb-1(a)-(b) ....................................................................................1

**Other Authorities**

Fed. R. Civ. P. 60(b) ..............................................................................................21

Fed R. Civ. P. 60(b)(5) ..........................................................................................21

Matthew J. Belvedere, *Trump Says He Trusts China's Xi On Coronavirus and the US Has it "Totally Under Control,"* CNBC (Jan. 22, 2020),
https://www.cnbc.com/2020/01/22/trump-on-coronavirus-from-china-we-have-it-totally-under-control.html..................................................................19

## INTRODUCTION

Plaintiffs Steven Chasin, Calvert Potter, Jasper Sterling, and Hassan Umrani ("Plaintiffs" or "*Potter* Plaintiffs") move this Court to hold Defendant District of Columbia ("Defendant") in civil contempt of the Court for the District of Columbia Fire and Emergency Medical Services Department's ("the Department" or "FEMS") blatant violations of the permanent injunction issued in these consolidated cases on October 29, 2007 (the "Permanent Injunction"). *See* Permanent Inj. and Order, *Potter* ECF No. 157. Plaintiffs are longtime firefighters and paramedics who, years ago, successfully brought suit to enjoin an unlawful Department policy that largely prohibited District firefighters and paramedics from maintaining facial hair.[1] Each Plaintiff wears a beard in accordance with the tenets of his Muslim or Jewish faith. The Permanent Injunction protects the *Potter* Plaintiffs' rights to maintain facial hair as expressions of their faith, as guaranteed by the Religious Freedom Restoration Act of 1993 ("RFRA").[2] Among other things, the Permanent Injunction prohibits the Department from enforcing against Plaintiffs policies requiring them to be clean-shaven.

While the *Potter* Plaintiffs collectively have provided more than 100 years of distinguished service to the Department and District residents, over the past several decades, the Department has

---

[1] Calvert L. Potter and Steven B. Chasin were the named plaintiffs in the two original consolidated proceedings. Messrs. Sterling and Umrani were co-plaintiffs. The other original plaintiffs have all since left or retired from the Department and are not participating in this motion.

[2] RFRA provides that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the government proves that applying its action to the plaintiff is *both* "in furtherance of a compelling governmental interest" *and* "the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)-(b). When an individual's religious exercise rights are violated, RFRA authorizes the individual to seek "appropriate relief" against the government, which may include an injunction against the rule, restoration to a position, back pay, or other money damages. *Id.* § 2000bb-1(c).

orchestrated repeated efforts to unlawfully remove Plaintiffs from active duty for refusing to shave their beards in violation of their faith. Most recently, on February 12, 2020, the Department issued a new policy prohibiting firefighters and paramedics from maintaining most types of facial hair. Notwithstanding this Court's Permanent Injunction, the Department enforced this policy against Plaintiffs and removed them from field duty in March 2020 when they refused to shave their beards and stood on their rights under RFRA and this Court's Permanent Injunction. Adding injury to injury, the Department reassigned Plaintiffs to less desirable and less well compensated administrative and logistical roles. Plaintiffs were not allowed to return to field duty until more than a year and a half later in late 2021. This decision to ignore a binding court order is merely the latest step in the Department's multi-decade crusade to compel District firefighters and paramedics to conform to the Department's clean-shave preference, without regard for their religious liberties. The Department's conduct demonstrates a fundamental disregard both for Plaintiffs' rights under RFRA and this Court's authority.

Accordingly, Plaintiffs respectfully request that this Court: (1) issue an order requiring Defendant to show cause for why it should not be held in civil contempt; (2) hold Defendant in civil contempt; (3) permit Plaintiffs to undertake limited discovery of the Department in order to completely and accurately quantify the damages they suffered as a result of the Department's unlawful conduct; and (4) award Plaintiffs appropriate compensatory damages.

## I. FACTUAL BACKGROUND

### A. Prior Litigation History

For decades, the Department has unsuccessfully sought to require its firefighters and paramedics to be clean-shaven while on duty. At the same time, it has offered an ever-shifting series of justifications for this requirement. For instance, by 1980, the Department had enacted a

clean-shaven policy that it alleged promoted safety, "fostered a sense of esprit de corps and aided public recognition of firefighters." *Kennedy v. Dixon*, 1991 WL 489548, at *1 (D.C. Super. Ct. Oct. 24, 1991), *aff'd in part, rev'd in part sub nom. Kennedy v. District of Columbia*, 654 A.2d 847 (D.C. 1994). When the policy was challenged, the D.C. Court of Appeals ruled that the Department's application of this policy violated the District of Columbia Human Rights Act. *Kennedy*, 654 A.2d at 856-57.

The Department again put forward similar policies in 1997 and 2001, ostensibly "to increase discipline, uniformity, safety and esprit de corp [sic] throughout th[e] Department." *See* Special Order No. 18, Series 2001 (issued Mar. 28, 2001), *Potter* ECF No. 2, Ex. A. The *Potter* Plaintiffs first challenged that policy in this Court in May 2001, and obtained a preliminary injunction the following month. *See* Prelim. Inj. Order, *Potter* ECF No. 34.

Following the terrorist attacks of September 11, 2001, the Department on October 10, 2002, announced that it was drafting yet another new grooming policy. *See* Joint Status Report, *Potter* ECF No. 39. When the Department had made little progress as of May 2004, this Court "ordered that the District's putative new policy be submitted to plaintiffs and to the Court by June 15, 2004." *See Potter v. District of Columbia*, 382 F. Supp. 2d 35, 37 (D.D.C. 2005). Disregarding that instruction, the Department did not release its new facial hair policy until February 2005. *Id.* Notwithstanding the fact that more than 3.5 years had passed since the September 11th terrorist attacks, the Department alleged that the new policy was "necessitated by the new and unique terrorism threat to this city." Def.'s Opp'n to Pls.' Mot. For Clarification of Prelim. Inj. at 3, *Potter* ECF No. 66. Under the new policy ("Special Order 20"),

> members who are required to wear tight fitting facepieces are not permitted to have: [A] Facial hair that comes between the sealing surface of the facepiece and the face or that interferes with the valve function; or [B] Any condition that interferes with the face to face piece seal or valve function.

Pls.' Mot. for Order to Show Cause, Second Sneed Decl. Ex. A at 4, *Potter* ECF No. 73-2.  The Department conceded that "for the vast majority of firefighter activity, a perfect seal between the face mask and the face is not required for safety." *Potter v. District of Columbia*, 2007 WL 2892685, at *7 (D.D.C. Sept. 28, 2007), *aff'd*, 558 F.3d 542 (D.C. Cir. 2009).  Nevertheless, it justified this policy based on speculation of a "mass casualty or terrorist event" that *could conceivably* require members to wear a specific type of mask (an air-purifying respirator or "APR") that *does* require a perfect seal. *Id.* at *8.

Applying RFRA, this Court held that the Department had failed to carry its burden of showing that banning bearded firefighters from field duty was the "least restrictive means" of furthering the Department's asserted safety interest, even under a hypothetical mass casualty scenario. *Id.* at *6, *8.  That was so for several interrelated reasons. First, "the Department [had] conceded that, for the vast majority of firefighter activity, a perfect seal between the face mask and the face is not required for safety." *Id.* at *7.  Second, the Department conceded that the most powerful form of respiratory protection that firefighters keep for the most hazardous environments—the positive-pressure self-contained breathing apparatus ("SCBA")—"is adequate to protect the bearded firefighter from any leakage that may be caused by facial hair," *id.* at *5, as the positive-pressure SCBA "will allow air to leak *out but not in*," *id.* at *7 (emphasis added). Third, the Court noted that "[t]he Department has been at pains to posit a situation in which the atmosphere is dangerous enough to pose a serious risk to the health and effectiveness of bearded firefighters, but which" would require lesser forms of protection than an SCBA. *Id.*  Finally, this Court explained that during any rare period in which an APR rather than an SCBA might be required, bearded firefighters could be reassigned temporarily "either 'up' to areas of duty where SCBA use is required, or 'down' to cold zone areas where no respiratory protection is needed."

*Id.* at *8.   This Court also made several findings that the Department's contentions lacked credibility.  *Id.* at *8–9.

Ultimately, this Court concluded that, apart from "the catastrophic scenario the Department imagines" (when "there will be time to assign the tiny minority of firefighters whose religions require them to wear beards away from negative pressure APR duty"), "the evidence shows that a beard has never interfered with the ability of a FEMS worker to do his duty, and is unlikely to do so." *Id.* at *9.

Accordingly, this Court entered a permanent injunction that, *inter alia*, provided for the following:

> 1. That the defendant and its officials, agents, and employees, are PERMANENTLY ENJOINED from enforcing the facial hair provisions of Special Order 20, Series 2005, against the plaintiffs.
>
> 2. That the defendant shall expeditiously restore to field duty each plaintiff still employed by the District of Columbia Fire and Emergency Medical Service who has been assigned to administrative duty because he has not been clean-shaven, after expeditiously providing any necessary refresher training.  So far as practicable, each such plaintiff shall be restored to the position he would have had but for his refusal to shave.
>
> 4. That, if any plaintiff claims that as a result of his refusal for religious reasons to comply with the Grooming Regulations or with Special Order 20, Series 2005, he has lost income, seniority or retirement benefits, or has lost or been forced to use sick leave, the parties will confer and seek in good faith to agree upon remedies for such losses. . . .

Permanent Inj. and Order, *Potter* ECF No. 157.

The Permanent Injunction was affirmed on appeal by the D.C. Circuit.  *See Potter*, 558 F.3d at 551.

## B.     The Department's Latest Facial Hair Policy

Between late 2019 and January 2020, each of the *Potter* Plaintiffs became aware of an effort by the Department to update its facial hair policy.  *See* Declaration of Calvert Potter ("Potter

Decl.") ¶ 8; Declaration of Hassan Umrani ("Umrani Decl.") ¶ 7; Declaration of Jasper Sterling ("Sterling Decl.") ¶ 8; Declaration of Steven Chasin ("Chasin Decl.") ¶ 8.  Thereafter, in January 2020, Messrs. Chasin and Potter both reached out to their former counsel in this matter, Arthur Spitzer of the ACLU, to discuss the Department's actions.  Potter Decl. ¶ 11; Chasin Decl. ¶ 9. Messrs. Chasin and Potter subsequently communicated with Mr. Spitzer on numerous occasions regarding the Department's new facial hair policy.  Potter Decl. ¶ 12; Chasin Decl. ¶ 9.  By January 23, 2020, Mr. Potter had received a draft copy of Safety Operations Bulletin No. 9 ("Bulletin No. 9"), which related to the use of personal protective equipment.  Potter Decl. ¶¶ 9–10.  Among other things, the draft of Bulletin No. 9 included a provision related to facial hair:

> [E]mployees who are required to wear tight-fitting face pieces are not permitted to have: 1. Facial hair that comes between the sealing surface of the face piece and the face. 2. Facial hair that interferes with the valve function. 3. Any condition that interferes with the face to face piece seal or valve function.

Potter Decl. Ex. A, at 2.  This bulletin mirrored the language of Special Order 20, which this Court had permanently enjoined Defendant from applying to Plaintiffs in *Potter*.[3]  The Department indicated that it planned to implement Bulletin No. 9 in April 2020, and attempted to justify its new policy by the purported need to "afford maximum personal protection during all types of emergency incidents—whether public service calls, training activities, emergency and routine travel on apparatus—and all non-emergency activities that could pose a hazard to the employee." *Id.* at 1.  Bulletin No. 9 made no reference to COVID-19 or any other public health emergency as the reason for its promulgation.  As far as Mr. Potter is aware, a final version of Bulletin No. 9 was never issued, and Bulletin No. 9 never went into effect.  Potter Decl. ¶ 9.

---

[3] At some point following the issuance of the permanent injunction in *Potter*, the Department began allowing *any* firefighter or paramedic to maintain facial hair of up to ¼ inch.  Potter Decl. ¶ 7; Chasin Decl. ¶ 7.  Thus, to effectuate its renewed desire that Members be clean-shaven, the Department in 2020 was apparently required to issue new regulations to that effect.

However, on February 12, 2020, the Department formally issued a new policy related to the use of personal protective equipment known as Safety Operations Bulletin No. 10 ("Bulletin No. 10"). *See* Chasin Decl. ¶ 11; *id*. Ex. A. Bulletin No. 10 included provisions regarding facial hair that were much the same as those included in Bulletin No. 9:

> Employees are not permitted to have: [1] Facial hair that comes between the sealing surface of the face piece and the face; [2] Facial hair that interferes with the valve function; or [3] Any condition that interferes with the face-to-face piece seal or valve function.

Chasin Decl. Ex. A, at 3, § 2.13. Again, this bulletin was virtually identical to the language of Special Order 20, which this Court had permanently enjoined Defendant from applying to Plaintiffs in *Potter*.

The revisions to the Department's facial hair policy set forth in Bulletin No. 10 were announced to Department personnel on February 12, 2020 via General Order No. 6. *See* Chasin Decl. Ex. A, at 1; *see also* Chasin Decl. ¶ 11; Potter Decl. ¶ 13. General Order No. 6 explains that the policy "intends to protect and enhance the safety of all members and thereby support our ability to provide efficient fire and emergency medical services to the residents and visitors of the District of Columbia," Chasin Decl. Ex. A, at 1, materially the same interests that Defendant previously offered when it unsuccessfully sought to justify applying its clean-shave preference to Plaintiffs before this Court in the prior litigation. Neither Bulletin No. 10 nor General Order 6 made any mention of COVID-19 or any other public health emergency as the reason this new policy was implemented. Pursuant to General Order 6, enforcement of the provisions of Bulletin No. 10 was initially scheduled to begin on April 5, 2020. *Id*. at 2.

Ultimately, the Department moved this implementation date forward to March 15, 2020 via Special Order No. 55. *See* Chasin Decl. Ex. B, at 1 (providing that, effective March 15, 2020, "[s]upervisors shall ensure that members under their command comply with the facial hair

directives in Safety Operations Bulletin No. 10"). Unlike any of the prior materials issued by the Department, Special Order 55 stated that "[t]he progression of the novel Coronavirus (COVID-19) necessitates the increased use of negative-pressure filtering face piece respirators, including N-95 masks and air-purifying respirators," and claimed that "[t]he presence of facial hair interferes with the mask's seal . . . ." *Id.*

## C.    Enforcement of The Department's New Facial Hair Policy Against Plaintiffs

The Department began enforcing its new facial hair policy against firefighters and paramedics—including Plaintiffs—in March 2020. Potter Decl. ¶ 14; Umrani Decl. ¶ 9; Sterling Decl. ¶ 10; Chasin Decl. ¶ 13. Between March 15 and March 17, 2020, each Plaintiff came to work prepared to begin his duly assigned duties as a firefighter or paramedic.[4] Potter Decl. ¶ 14; Umrani Decl. ¶ 9; Sterling Decl. ¶ 10; Chasin Decl. ¶ 13. However, because all four Plaintiffs came to work with facial hair, they were prohibited from assuming their regular duties and were instead reassigned to logistical positions within the Department. Potter Decl. ¶¶ 14–17; Umrani Decl. ¶¶ 9–12; Sterling Decl. ¶¶ 10–13; Chasin Decl. ¶¶ 13–16. Each Plaintiff immediately made clear to his supervising officer that he did not consent to the reassignment, which he believed was in direct violation of the *Potter* Permanent Injunction issued by this Court. Potter Decl. ¶ 16; Umrani Decl. ¶ 11; Sterling Decl. ¶ 11; Chasin Decl. ¶ 14. Plaintiffs understand that Bulletin No. 10 currently remains in effect, inclusive of minor modifications made in June 2021. *See* Chasin Decl. ¶ 20; Chasin Decl. Ex. C.

As a result of their forced reassignments, the *Potter* Plaintiffs suffered significant disruptions, financial harm, and lifestyle interruptions, including but not limited to the following:

---

[4] Mr. Potter worked in the Department's Special Operations Division, Mr. Umrani worked as a firefighter/EMT, and Messrs. Sterling and Chasin were paramedics. *See* Potter Decl. ¶ 3; Umrani Decl. ¶ 3; Sterling Decl. ¶ 3; Chasin Decl. ¶ 3.

Mr. Potter received less total compensation during the period of his reassignment than he would have received if he had been allowed to remain on field duty. Potter Decl. ¶ 21. Specifically, he had fewer opportunities to earn overtime, holiday, weekend, and night-differential pay throughout this period. *Id.* As a result of Mr. Potter's decreased income during this time, he and his family experienced increased stress and frustration. *Id.* ¶ 23. Further, while working in the field, Mr. Potter was required to be on-duty for 24 hours, followed by 72 hours off-duty. *Id.* ¶ 22. Once he was reassigned, Mr. Potter was required to work during normal business hours, five days per week. *Id.* This change required him to make more trips to work each week, which resulted in increased wear and tear on his vehicle and required him to purchase more gasoline. *Id.*

Mr. Umrani, like the other Plaintiffs, also received less total compensation during the period of his reassignment than he would have received if he had been allowed to remain on field duty. Umrani Decl. ¶ 14. Specifically, he had fewer opportunities to earn overtime, holiday, weekend, and night-differential pay throughout this period. *Id.* Also like the other Plaintiffs, Mr. Umrani's reassignment forced him to shift from a work schedule of 24 hours on-duty followed by 72 hours off-duty to a work schedule of five days per week during normal business hours. *Id.* ¶ 15. This caused significant scheduling disruptions for Mr. Umrani and his family. *Id.* Further, Mr. Umrani's reassignment required him to make more trips to work each week, which resulted in increased wear and tear on his vehicle, and required him to purchase more gasoline. *Id.* ¶ 16. Moreover, once Mr. Umrani's car broke down and he began commuting to work via rideshare (e.g. Uber and Lyft), he incurred additional rideshare expenses as a result of his reassignment. *Id.* Finally, Mr. Umrani's reassignment required him to pass up job training opportunities and forego a possible promotion because he was not allowed to work in the field. *Id.* ¶ 17.

Mr. Sterling, like the other Plaintiffs, also received less total compensation during the period of his reassignment than he would have received if he had been allowed to remain on field duty. Sterling Decl. ¶ 15. Specifically, he had fewer opportunities to earn overtime, holiday, weekend, and night-differential pay throughout this period. *Id.* Also like the other Plaintiffs, Mr. Sterling's reassignment forced him to shift from a work schedule of 24 hours on-duty followed by 72 hours off-duty to a work schedule of eight hours per day during regular business hours. *Id.* ¶ 16. This caused significant scheduling disruptions for Mr. Sterling and his family. *Id.* His sudden reassignment forced him to use leave time to attend medical appointments and other obligations that he typically attended on his days off. *Id.* Further, as a result of this new schedule, he was no longer able to take his son to school on his days off, which was disruptive to his family. *Id.* ¶ 18. Finally, Mr. Sterling's reassignment required him to make more trips to work each week, which resulted in increased wear and tear on his vehicle, and required him to purchase more gasoline. *Id.* ¶ 17.

Mr. Chasin, like the other Plaintiffs, also received less total compensation during the period of his reassignment than he would have received if he had been allowed to remain on field duty. Chasin Decl. ¶ 21. Specifically, he had fewer opportunities to earn overtime, holiday, weekend, and night-differential pay throughout this period. *Id.* Also like the other Plaintiffs, Mr. Chasin's reassignment forced him to shift from a work schedule of 24 hours on-duty followed by 72 hours off-duty to a work schedule of eight hours per day, five days per week. *Id.* ¶ 22. Mr. Chasin's sudden reassignment thus forced him to use leave time to attend medical appointments and other obligations that he had previously scheduled to attend on his days off.[5] *Id.*

---

[5] As discussed below, Mr. Chasin remained in his logistical position until March 2021, when he was able to transfer to the position of FEMS Salesforce Administrator. Chasin Decl. ¶ 17. He continues to work in that position and wishes to continue doing so. *Id.*

### D.       Plaintiffs' Restoration to Field Duty and Attempts to Obtain Compensation

In March 2020, prior to the implementation of Bulletin No. 10, Mr. Spitzer sent a letter to the Department to protest the Department's new facial hair policy, which, he explained, was "exactly the same rule" that had been permanently enjoined by this Court. Declaration of Arthur B. Spitzer ("Spitzer Decl.") ¶ 7; *id*. Ex. A at 1. Mr. Spitzer later spoke to D.C. Senior Assistant Attorney General Andrew Saindon about this letter on March 19, 2020. Spitzer Decl. ¶ 10. At no point during this conversation, nor at any other time, did Mr. Spitzer consent to Plaintiffs' reassignment or removal from field duty. Spitzer Decl. ¶ 11. Moreover, Mr. Spitzer had no authority from Plaintiffs to consent to any such reassignment or removal. *Id*.

Between April and October 2020, Mr. Potter tried to contact Mr. Spitzer on several occasions, but received no response. Potter Decl. ¶ 18. On November 2, 2020, Mr. Spitzer informed Mr. Potter by email that his official representation of Mr. Potter and the other Plaintiffs in this litigation ended with the conclusion of the litigation years earlier. *Id*. ¶ 19; Chasin Decl. ¶ 18. Mr. Spitzer further informed Mr. Potter that he would not represent Plaintiffs going forward in their dispute with the Department. Potter Decl. ¶ 19; Chasin Decl. ¶ 18; Spitzer Decl. ¶ 12. Thereafter, Plaintiffs sought out new counsel. First Liberty Institute agreed to represent Plaintiffs in late February 2021, and Covington & Burling LLP subsequently joined the representation in April 2021. Chasin Decl. ¶ 19.

On August 9, 2021, Plaintiffs' new counsel, Robert K. Kelner of Covington & Burling LLP, wrote to the Office of the Attorney General for the District of Columbia ("Attorney General's Office") requesting that the Department cease enforcement of its facial hair policy against Plaintiffs, restore them to field duty, and compensate them for the injuries they had suffered as a result of having been removed from field duty. Declaration of Robert K. Kelner ("Kelner Decl.")

11

¶ 3. His letter again made clear that by enforcing Bulletin No. 10 against Plaintiffs, the Department had violated both the Permanent Injunction and Plaintiffs' rights under RFRA. *Id.* It also outlined the injuries suffered by Plaintiffs as a result of their forced reassignments. *Id.*

Three days later, on August 12, 2021, Mr. Saindon responded by email and agreed to return Plaintiffs to field duty. *Id.* ¶ 4; *id.* Ex. A. ("[N]ow that the public health emergency has ended, FEMS is prepared to return plaintiffs to their previous firefighter and paramedic positions."). Despite this initial commitment, the Department did not arrange for Plaintiffs to begin an apparently mandatory Return to Operations course until October 4, 2021—nearly two months later. Kelner Decl. ¶ 5. Thereafter, Plaintiffs Potter, Sterling, and Umrani were eventually restored to their field positions on October 10, 2021 (Potter), October 17, 2021 (Sterling), and December 14, 2021 (Umrani). Potter Decl. ¶ 20; Sterling Decl. ¶ 14; Umrani Decl. ¶ 13. Mr. Chasin remained in his logistical position until March 2021, when he was able to transfer to the position of FEMS Salesforce Administrator. Chasin Decl. ¶ 17. He continues to work in that position and wishes to continue doing so. *Id.*

After Plaintiffs had been restored to their positions in the field, Mr. Kelner wrote to Mr. Saindon on January 31, 2022 with an offer to settle Plaintiffs' outstanding claims for damages that had accrued during the time they were removed from field duty in violation of the Permanent Injunction. Kelner Decl. ¶ 6. Mr. Saindon responded on May 31, 2022, rejecting the settlement terms set forth in Mr. Kelner's letter. *Id.* ¶ 8. Before filing this motion, Mr. Kelner again reached out to Mr. Saindon, and further settlement discussions occurred on October 26, 2022. *Id.* ¶¶ 9-10. Thereafter, Mr. Kelner sent Mr. Saindon a revised settlement offer on October 28, 2022. *Id.* ¶ 11. Mr. Saindon responded on November 3, 2022, again rejecting the terms set forth in Mr. Kelner's offer. *Id.* ¶ 12. In light of these communications, it has become clear that further settlement

discussions are unlikely to be productive. *Id.* ¶¶ 12-13. Accordingly, Plaintiffs now seek this Court's intervention to vindicate their rights.[6]

## II.   ARGUMENT

### A.   Legal Standard

"Federal court orders are to be obeyed unless and until litigants succeed in having them duly overturned by the appropriate court of appeals. Litigants may not defy court orders because their commands are not to the litigants' liking." *Unitronics (1989) (R"G) Ltd. v. Gharb*, 85 F. Supp. 3d 133, 139 (D.D.C. 2015) (quoting *Am. Rivers v. U.S. Army Corps of Eng'rs*, 274 F. Supp. 2d 62, 70 (D.D.C. 2003)). When a party disregards a duly issued court order, "[t]here can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani v. United States*, 384 U.S. 364, 370 (1966); *see also Broderick v. Donaldson*, 437 F.3d 1226, 1234 (D.C. Cir. 2006) ("The power to punish for contempts is inherent in all courts; its existence is essential to . . . the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice." (citation omitted)); *Gharb*, 85 F. Supp. 3d at 139 ("Courts have inherent authority to enforce compliance with their orders through contempt proceedings."). Accordingly, courts may enforce an injunctive order through contempt. *See Phillips v. Mabus*, 894 F. Supp. 2d 71, 91 (D.D.C. 2012) ("An order granting injunctive relief is enforceable by the district court's power of contempt."); *see also McCall-Bey v. Franzen,* 777 F.2d 1178, 1183 (7th Cir. 1985) ("When an equity case ends in a permanent injunction, the trial

---

[6] Troublingly, while the Department has, for now, restored Plaintiffs to field duty after substantial delay, it continues to insist that its facial hair policies do not violate the Permanent Injunction. Kelner Decl. ¶ 8. Likewise, the Department has not ruled out the possibility of enforcing its facial hair policies against Plaintiffs in the future, notwithstanding the Permanent Injunction. *Id.* ¶¶ 8, 12. This continued equivocation from the Department only reinforces the importance of granting Plaintiffs' request for a finding of contempt.

court, with or without an explicit reservation of jurisdiction, retains jurisdiction to enforce the injunction, as by contempt proceedings."); *Am. Mining Cong. v. U.S. Army Corps of Eng'rs*, 120 F. Supp. 2d 23, 27 (D.D.C. 2000) (same).

A party moving for a finding of contempt "bears the initial burden of demonstrating by clear and convincing evidence that: (1) there was a clear and unambiguous court order in place; (2) that order required certain conduct by Defendants; and (3) Defendants failed to comply with that order." *United States v. Latney's Funeral Home, Inc.*, 41 F. Supp. 3d 24, 29-30 (D.D.C. 2014). "The defendants' intent in failing to comply with a court order is irrelevant." *CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 22, 26 (D.D.C. 2015); *see also SEC v. Bilzerian*, 112 F. Supp. 2d 12, 16 (D.D.C. 2000) (in the context of a contempt proceeding, the defendant's "intent is irrelevant; the Court need not find that his failure to comply with the orders was willful or intentional"). "Once the above three-part showing is made, the burden shifts to the nonmoving party to provide adequate detailed proof justifying noncompliance." *12 Percent Logistics, Inc. v. Unified Carrier Registration Plan Bd.*, 316 F. Supp. 3d 22, 25 (D.D.C. 2018).

**B.    The Department Should Be Held In Contempt for Violating the Permanent Injunction.**

Plaintiffs satisfy each prong of the three-part test this Court uses to determine whether a party should be held in civil contempt: This Court's Permanent Injunction is clear and unambiguous; it expressly requires specific conduct by the Department; and the Department has demonstrably failed to comply with these requirements. Thus, the Department should be held in contempt.

*First*, the Permanent Injunction that the Department has flouted is both clear and unambiguous, as it "does not leave any reasonable doubt as to what behavior was expected and who was expected to behave in the indicated fashion." *Trade Exch. Network*, 117 F. Supp. 3d at

14

26 (quotations and citation omitted); *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989) (to support contempt, "an injunction must be specific and definite enough to apprise those within its scope of the conduct that is being proscribed." (citation omitted)). The Permanent Injunction plainly sets forth the specific conduct that is proscribed; namely, the "defendant and its officials, agents, and employees, are PERMANENTLY ENJOINED from enforcing the facial hair provisions of Special Order 20, Series 2005, against the plaintiffs." Permanent Inj. and Order, *Potter* ECF No. 157; *see, e.g.*, *MasTec Advanced Techs. v. NLRB*, 2021 WL 4935618, at *13 (D.D.C. June 3, 2021) (finding an NLRB order requiring the defendant to take specific enumerated actions to be clear and unambiguous); *cf. Act Now to Stop War & End Racism Coal. v. District of Columbia*, 2013 WL 12380268, at *2 (D.D.C. Aug. 23, 2013) (finding that a court order was not clear and unambiguous where it was "completely silent on an issue").

The entities subject to the Permanent Injunction are clear—the defendant in this action (the District of Columbia and its Fire and Emergency Medical Services Department), along with its "officials, agents, and employees." *See Potter* Compl. ¶ 1, *Potter* ECF No. 1 ("This is an action to compel the District of Columbia and the District of Columbia Fire and Emergency Medical Services Department . . . and its officials to abide by its obligation not to interfere with the religious practices of its members.").

The conduct enjoined by this Court (which the Department has undertaken nonetheless) is also clear; namely, the Department may not "enforc[e] the facial hair provisions of Special Order 20, Series 2005." Permanent Inj. and Order, *Potter* ECF No. 157. As noted previously, the facial hair provisions of Special Order 20 provide that members "who are required to wear tight fitting facepieces are not permitted to have: (A) Facial hair that comes between the sealing surface of the facepiece and the face or that interferes with the valve function; or (B) Any condition that interferes

15

with the face to face piece seal or valve function." Pls.' Mot. for Order to Show Cause, Second Sneed Decl. Ex. A at 4, *Potter* ECF No. 73-2. In other words, the Permanent Injunction prohibits the Department from enforcing both the requirement that members "are not permitted to have . . . [f]acial hair that comes between the sealing surface of the facepiece and the face or that interferes with the valve function," and the requirement that members "are not permitted to have . . . [a]ny condition that interferes with the face to face piece seal or valve function." *See id.*

Finally, the individuals protected by the Permanent Injunction are clear—the plaintiffs in this action, including Messrs. Chasin, Potter, Sterling, and Umrani.

**Second**, the Permanent Injunction requires specific conduct by the Department. Specifically, it requires the Department to refrain from enforcing the facial hair provisions of Special Order 20 against Plaintiffs.

**Third**, it is likewise clear that the Department failed to comply with this Court's Permanent Injunction when it removed Plaintiffs from field duty. The Department's stated rationale for removing Plaintiffs from field duty was their failure to comply with the facial hair provisions of Bulletin No. 10. Potter Decl. ¶¶ 14–15; Sterling Decl. ¶ 10; Umrani Decl. ¶¶ 9–10; Chasin Decl. ¶ 13. And those provisions are virtually identical to the facial hair provisions of Special Order 20 that were permanently enjoined by this Court. Indeed, the only substantive difference between the facial hair provisions of Special Order 20 and the facial hair provisions of Bulletin No. 10 is that Special Order 20 applied only to employees "who are required to wear tight fitting facepieces," while Bulletin No. 10 apparently applies to all "employees." Thus, by removing Plaintiffs from field duty for failing to comply with the facial hair provisions of Bulletin No. 10, the Department violated the Permanent Injunction's instruction that the Department may not enforce the facial hair provisions of the nearly-identical Special Order 20.

Moreover, the Department was on notice that its enforcement of Bulletin No. 10 against Plaintiffs violated the Permanent Injunction, yet nevertheless persisted. When they were initially removed from field duty, Plaintiffs made clear that they did not consent to their reassignment, and that they believed the Department's actions violated the Permanent Injunction. Potter Decl. ¶ 16; Sterling Decl. ¶ 11; Umrani Decl. ¶ 11; Chasin Decl. ¶ 14. Further, as early as March 2020, Plaintiffs' prior counsel made clear to the Department that enforcement of Bulletin No. 10 against Plaintiffs violated the Permanent Injunction. *See* Spitzer Decl. Ex. A.

Accordingly, Plaintiffs have satisfied all three elements necessary to make out their prima facie case that the Department should be held in civil contempt of this Court's Permanent Injunction.

### C.   The Department's Failure to Comply with The Permanent Injunction Cannot Be Justified.

Noncompliance with a court's order can only be justified in two narrow circumstances, neither of which have occurred here. First, a defendant may justify noncompliance through a showing—"categorically and in detail"—that it "is unable to comply with the orders." *See Bilzerian*, 112 F. Supp. 2d at 18 (citation omitted); *Am. Rivers v. U.S. Army Corps of Eng'rs*, 274 F. Supp. 2d 62, 66 (D.D.C. 2003) ("[I]mpossibility exists only when a party demonstrates that it is 'powerless to comply' with a court's order . . . ."). There is no plausible argument that the Department is unable to comply with the Permanent Injunction. The Permanent Injunction prohibits the Department from enforcing specific facial hair rules against a specific subset of firefighters and paramedics (*i.e.*, the Plaintiffs in this action). Since the Permanent Injunction is a *prohibitory* injunction that merely directs the Department to forbear from taking specific actions rather than a *mandatory* injunction requiring the Department to take a specific affirmative act, it defies credulity to suggest that the Department is unable to comply.

Second, a defendant may also justify noncompliance by showing "good faith substantial compliance with the orders." *Bilzerian*, 112 F. Supp. 2d at 18 n.5. "To prove good faith substantial compliance, the contemnor must show that it 'took all reasonable steps within [its] power to comply.'" *Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Artharee*, 48 F. Supp. 3d 25, 30 (D.D.C. 2014) (quoting *Int'l Painters & Allied Trades Indus. Pension Fund v. ZAK Architectural Metal & Glass LLC*, 736 F. Supp. 2d 35, 40 (D.D.C. 2010)).  The Department's conduct here does not constitute "substantial compliance" with the Permanent Injunction.  Indeed, the entire purpose of the Permanent Injunction was to prohibit the Department from enforcing a facial hair policy against Plaintiffs that was nearly identical to the Department's current facial hair policy and to recompense Plaintiffs for the Department's prior violations of their rights.  *See supra* Section I.A; *Potter*, 2007 WL 2892685, at *1 ("I have concluded that in the District of Columbia . . . the fire department may not impose a shaving requirement on men who wear their beards for religious reasons.").  The Department's contravention of the core of the Permanent Injunction—by imposing on the *Potter* Plaintiffs "a shaving requirement on men who wear their beards for religious reasons"—cannot credibly be deemed substantial compliance with the Permanent Injunction.  *See Food Lion, Inc. v. United Food & Commercial Workers Int'l Union, AFL-CIO-CLC,* 103 F.3d 1007, 1018-19 (D.C. Cir. 1997) (no good faith substantial compliance with a court order compelling production of all relevant records where the defendant failure to search off-site records); *In re Grand Jury Investigation of Possible Violations of 18 U.S.C. § 1956 & 50 U.S.C. § 1705*, 2019 WL 2182436, at *4 (D.D.C. Apr. 10, 2019) (finding that banks' good faith searches for and collection and preservation of documents responsive to a subpoena did not constitute good faith substantial compliance with an order requiring production of those documents).

Finally, any insinuation that the Department's decision to flout the Permanent Injunction can be justified or excused by the onset of the COVID-19 pandemic is unavailing as a matter of both fact and law.

**First**, the factual record belies any suggestion that the COVID-19 pandemic was the reason the Department issued the facial hair rules included in Bulletin No. 10. Plaintiffs learned of the anticipated policy change no later than mid-January 2020, *see* Potter Decl. ¶ 8; Sterling Decl. ¶ 8; Umrani Decl. ¶ 7; Chasin Decl. ¶ 8, before the U.S. government had even announced the first confirmed COVID-19 case in the United States.[7] Mr. Potter likewise received a copy of Bulletin No. 9—including its new facial hair rules—around the time of the very first announced case of COVID-19 in the United States. Potter Decl. ¶¶ 9–10. Moreover, Bulletin No. 9 itself made no mention of COVID-19 or *any* kind of public health emergency. Rather, it was justified as a means of addressing "all types of emergency incidents—whether public service calls, training activities, emergency and routine travel on apparatus—and all non-emergency activities that could pose a hazard to the employee." Potter Decl. Ex. A, at 1. Further, the fact that Bulletin No. 9 set an initial implementation date of April 2020—*three months* after the policy was released—suggests that Bulletin No. 9 was not drafted in response to a public health emergency requiring immediate attention.

Similarly, General Order 6 and Bulletin No. 10, circulated on February 12, 2020, also made no mention of the COVID-19 pandemic as the Department's reason for enacting its new facial hair policy. General Order 6 only mentions the Department's broad desires to "protect and enhance

---

[7] *See, e.g.*, Matthew J. Belvedere, *Trump Says He Trusts China's Xi On Coronavirus and the US Has it "Totally Under Control,"* CNBC (Jan. 22, 2020), https://www.cnbc.com/2020/01/22/trump-on-coronavirus-from-china-we-have-it-totally-under-control.html ("The Centers for Disease Control and Prevention on [January 21] confirmed the first case in the United States").

the safety of all members" and enhance personal protective equipment performance in "harsh environments." *See* Chasin Decl. Ex. A, at 1; *see also Potter*, 2007 WL 2892685, at *5 (reciting the kinds of very rare harsh environments—such as terrorist attacks—that the masks at issue are used for). Further, like Bulletin No. 9, Bulletin No. 10 set an implementation date of April 2020, *see* Chasin Decl. Ex. A, at 3, suggesting that even by February 12, 2020—with COVID-19 beginning to circulate—the Department saw no need to revise its original timeline for implementing the new policy.

By contrast, Special Order No. 55—which was not issued until March 12, 2020—accelerated the implementation of the Department's new facial hair policy that was already scheduled for implementation, and first cited COVID-19 as its purported justification for doing so. *See* Chasin Decl. Ex. B, at 1. Notably, however, even Special Order No. 55 did not cite COVID-19 as the reason for the *underlying policy*; rather, it simply cited COVID-19 as the reason for *accelerating* the implementation of Bulletin No. 10. *Id.* The Department's actions thus make clear that the COVID-19 pandemic was not the reason for the Department's decision to issue Bulletin No. 10.

**Second**, any insinuation that the COVID-19 pandemic represents a significant changed circumstance that would warrant modification of the Permanent Injunction under Federal Rule of Civil Procedure ("Rule") 60(b) or any other rule or principle of equity is unfounded. The Department cannot unilaterally choose to ignore a federal court order. The Supreme Court noted long ago that permitting a party to modify the terms of a court order on its own accord, without judicial oversight—as the Department has done here—is deeply corrosive to the rule of law. *See Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 450 (1911) ("If a party can make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set

them aside, then are the courts impotent, and what the Constitution now fittingly calls the 'judicial power of the United States' would be a mere mockery.").

To that end, the Federal Rules of Civil Procedure are clear—only a court, *acting upon a motion* from the aggrieved party, has the authority to relieve that party of its obligations under a court order. *See* Rule 60(b) ("On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons . . . ."); *see also Salazar ex rel. Salazar v. District of Columbia*, 633 F.3d 1110, 1116 (D.C. Cir. 2011) (in order to be availed of Rule 60(b), a party must make a motion "within a reasonable time"). The Department is not entitled to relief from its obligations under the Permanent Injunction until the Department proves that such a modification is warranted. *See Horne v. Flores*, 557 U.S. 433, 447 (2009) (under Rule 60(b)(5), "[t]he party seeking relief bears the burden of establishing that changed circumstances warrant relief . . . ."). The Department should be well aware of Rule 60(b), given that Judge Williams specifically addressed this point earlier in this litigation. *See Potter*, 558 F.3d at 554 (Williams, J. concurring). Citing Rule 60(b)(5), Judge Williams explained that if the Department wished to seek relief from the Permanent Injunction, it would need to do so by convincing the court of "a significant change either in factual conditions or in law." *Id.* (citation omitted). The Department plainly did not heed this instruction here.

## III.   REQUESTED RELIEF

For the reasons discussed above, Plaintiffs respectfully request that this Court order Defendant to show cause as to why it should not be held in contempt, and that this Court find Defendant in contempt of the Permanent Injunction. Further, Plaintiffs also request that that this Court order Defendant to provide compensatory relief to Plaintiffs to redress injuries they sustained between March 15, 2020 and December 14, 2021 as a direct result of their unlawful

removal from field duty, in violation of the Permanent Injunction. *See Latney's Funeral Home*, 41 F. Supp. 3d at 29 ("A civil contempt action is characterized as remedial in nature, used to obtain compliance with a court order or to compensate for damages sustained as a result from noncompliance." (citation omitted)); *see also Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 838 (1994) (discussing the "longstanding authority of judges . . . to enter broad compensatory awards for all contempts through civil proceedings").

First, Plaintiffs request an award of damages equal to their loss of income, leave, and related benefits that resulted from the Department's violation of the Permanent Injunction. Compensatory damages of this nature are routinely awarded in contempt proceedings. *See, e.g.*, *EEOC v. Guardian Pools, Inc.*, 828 F.2d 1507, 1515 (11th Cir. 1987) ("We find that a variety of contempt sanctions may be imposed, including an award of back pay . . . ."); *EEOC v. Local 638 . . . Local 28 of the Sheet Metal Workers' Int'l Assn.*, 117 F. Supp. 2d 386, 394 (S.D.N.Y. 2000) (ordering union to provide back pay to workers after finding union in contempt of the court's Amended Affirmative Action Plan and Order). Further, this category of damages directly mirrors the damages this Court awarded Plaintiffs in 2007 under the Permanent Injunction. *See* Permanent Inj. and Order, *Potter* ECF No. 157 ("[I]f any plaintiff claims that . . . he has lost income, seniority or retirement benefits, or has lost or been forced to use sick leave, the parties will confer and seek in good faith to agree upon remedies for such losses."). And, as this Court has already recognized, back pay and similar economic losses are compensable damages under RFRA. *See* Mem. Order at 3, *Potter* ECF No. 181.

Second, Plaintiffs request an award of damages sufficient to compensate them for out-of-pocket expenses they incurred as a result of the Department's violation of the Permanent Injunction. For instance, Plaintiffs incurred a variety of additional transportation expenses as a

result of their forced reassignments, which required Plaintiffs to come to work five days per week instead of their prior field duty schedule of 24 hours on-duty followed by 72 hours off-duty. Potter Decl. ¶ 22; Sterling Decl. ¶¶ 16–17; Umrani Decl. ¶¶ 15–16. This change caused a net increase in their weekly round trips to work, which increased their gasoline expenses and caused added wear and tear on their vehicles. Potter Decl. ¶ 22; Sterling Decl. ¶¶ 16–17; Umrani Decl. ¶¶ 15–16. Further, after Mr. Umrani began commuting to work via rideshare, this change significantly increased his weekly rideshare expenses. Umrani Decl. ¶ 16.

Third, Plaintiffs request an award of non-economic damages sufficient to compensate them for the fact that their forced reassignments upended their lives for more than a year and a half, resulting in substantial personal and familial disruptions and loss of career advancement opportunities. *See, e.g.*, *Medina v. Buther*, 2019 WL 4370239, at *24-25 (S.D.N.Y. Sept. 12, 2019) (awarding compensatory damages in civil contempt proceeding for "mental anguish" as well as "physical pain and suffering"); *Schwartz v. Rent-A-Wreck of Am.*, 261 F. Supp. 3d 607, 620-21 (D. Md. 2017) (awarding damages for reputational harm in civil contempt proceeding); *Davis v. Sutton*, 2005 WL 3434633, at *3-4 (W.D. Tenn. Dec. 13, 2005) (awarding compensatory pain and suffering damages in contempt proceeding).[8]

---

[8] While this Court has previously declined to find that non-economic damages are available to Plaintiffs under RFRA, *see* Mem. Order at 3, *Potter* ECF No. 181, the non-economic damages Plaintiffs request in this motion materially differ from the non-economic damages that were the subject of this Court's prior ruling. Previously, Plaintiffs brought non-economic damage claims related to "emotional distress" and "anxiety" deriving from the fact that they "had to live for years in doubt about the economic viability of living observantly in their faiths" and that some plaintiffs "felt they had no alternative but to violate the teachings of their faiths." Pls.' Mot. Partial Summ. J. at 1, 8, *Potter* ECF No. 175. These claims were intimately intertwined with the plaintiffs' personal religious beliefs, and accordingly, this Court declined to award non-economic damages because "claims for emotional distress (the most common form of compensatory damages in discrimination cases) would inevitably lead to discovery of and disputes about the sincerity and importance of religious beliefs . . . ." Mem. Order at 3, *Potter* ECF No. 181. Here, Plaintiffs are

Finally, Plaintiffs request an award of damages equal to the costs and attorney's fees of litigating this contempt motion. *See, e.g.*, *Landmark Legal Found. v. EPA*, 272 F. Supp. 2d 70, 76 (D.D.C. 2003) ("[A] court may order a civil contemnor to compensate the injured party for losses caused by the violation of the court order, and such an award will often consist of reasonable costs (including attorneys' fees) incurred in bringing the civil contempt proceeding."); *see also Gharb*, 85 F. Supp. 3d at 128 ("Attorney fees are warranted here to compensate Unitronics for money damages sustained as a result of Mr. Gharb's noncompliance with the Injunction Order.").

The largest category of damages Plaintiffs are owed is likely the various forms of compensation Plaintiffs were denied due to their unlawful reassignments to less desirable logistical positions within the Department. However, Plaintiffs respectfully submit that the precise amount of such damages that they are owed cannot be ascertained adequately without limited discovery of the Department. As one example, Plaintiffs had only limited opportunities to work overtime during the period they were reassigned to logistical positions—certainly fewer such opportunities than individuals working in the field. Potter Decl. ¶ 21; Sterling Decl. ¶ 15; Umrani Decl. ¶ 14; Chasin Decl. ¶ 21. However, without the opportunity to review Department-wide overtime data for the period in which they were reassigned, Plaintiffs cannot accurately estimate the overtime-related damages that they are owed. Access to the Department's human resources data may also be necessary to accurately quantify the amount of holiday, evening, and weekend differential pay Plaintiffs were denied during the period of their reassignments.

---

not advancing emotional distress claims: the non-economic damages they seek turn on the substantial *disruptions* caused by the Department's unlawful removal of Plaintiffs from field duty. The types of damages Plaintiffs have suffered are no different than the damages one might find in a typical employment discrimination lawsuit wholly unrelated to religion. Accordingly, the amount of such damages owed can be ascertained without an inquiry into "the sincerity and importance of religious beliefs."

Where, as here, a moving party has made a prima facie showing of contempt, the court is empowered to authorize discovery necessary to fully resolve issues bearing upon the question of contempt. *See Wesley Jensen Corp. v. Bausch & Lomb, Inc.*, 256 F. Supp. 2d 228, 229 (D. Del. 2003) ("To obtain discovery based on allegations of civil contempt, [the movant] must make a prima facie showing that a court order has been disobeyed."); *Cardell Fin. Corp. v. Suchodolski Assocs., Inc.*, 2012 WL 12932049, at *57-58 (S.D.N.Y. July 17, 2012) (collecting cases applying this same rule). Accordingly, it is not uncommon for courts to grant limited discovery in contempt proceedings, including on the issue of damages. *See, e.g.*, *Cal. Expanded Metal Prods. Co. v. Klein*, 2021 WL 4078072, at *1 (W.D. Wash. Sept. 8, 2021) (ordering bifurcation of a contempt proceeding into an initial liability phase, to be followed by supplemental discovery and a damages phase if the defendant was held in contempt); *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 2017 WL 1173928, at *5 (M.D. Pa. Mar. 29, 2017) (allowing limited discovery in contempt proceeding); *Mendoza v. Regis Corp.*, 2005 WL 1109262, at *2, *4 (W.D. Tex. Mar. 21, 2005) (permitting "limited discovery on defendants' profits" to inform damages analysis in proceeding concerning civil contempt of injunction); *United States v. IBM Corp.*, 60 F.R.D. 650, 653 (S.D.N.Y. 1973) ("[T]he court has decided to allow at least limited discovery by IBM against the government on the issue of the damages occasioned by IBM's failure to comply with this court's order . . . ."). Indeed, the due process rights of "both the alleged contemnor and the complainant" may require discovery in civil contempt proceedings as necessary "to resolve relevant factual disputes . . . ." *Tranzact Techs., Inc. v. 1Source Worldsite*, 406 F.3d 851, 855 (7th Cir. 2005).

Accordingly, if this Court finds Defendant in contempt of the Permanent Injunction, Plaintiffs request limited discovery of the Department on the issue of damages and a separate

briefing schedule in which the parties may submit evidence, argument and, if necessary, expert testimony, related to the total amount of damages to which Plaintiffs are entitled.

## CONCLUSION

For all of the foregoing reasons, the Court should order Defendant to show cause as to why it should not be held in contempt, find Defendant in contempt, and permit Plaintiffs to take limited discovery of the Department on the issue of damages suffered as a result of Defendant's contemptuous conduct.

Dated: November 7, 2022

Respectfully submitted,

*/s/ Kevin B. Collins*
Robert K. Kelner (D.C. Bar No. 466880)
Kevin B. Collins (D.C. Bar No. 445305)
Lucas Moench (D.C. Bar No. 1616844)*
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001-4956
Tel. 202-662-6000
rkelner@cov.com
kcollins@cov.com
lmoench@cov.com

Jordan E. Pratt (D.C. Bar No. 90001376)*
Rebecca Dummermuth (D.C. Bar No. 482809)
First Liberty Institute
227 Pennsylvania Ave., SE
Washington, D.C. 20003
Tel. 972-941-4444
jpratt@firstliberty.org
bdummermuth@firstliberty.org

* Application for admission pending in this Court.

*Counsel for Plaintiffs Steven Chasin, Calvert Potter, Jasper Sterling, and Hassan Umrani*